CLERK'S OFFICE U.S. DISTRICT COURT
AT ABINGDON, VA
FILED

JUL 25 2024

BY: /s/ [signature], CLERK
DEPUTY CLERK

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

2031 Apperson Drive, Salem, Virginia 24153, Unit #D028

Case No. 1:24mj47

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the Western District of Virginia, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy to possess with intent to distribute and distribute methamphetamine and fentanyl, Schedule II controlled substances |

The application is based on these facts:
See Affidavit/Attachment C.

☒ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____*)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Joshua Evans, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means).*

Date: 7/24/24

City and state: Lebanon, ~~Abingdon~~, VA

*Judge's signature*

U.S. Magistrate Judge Pamela Meade Sargent
*Printed name and title*

ATTACHMENT C

AFFIDAVIT of
Special Agent Joshua Evans
Drug Enforcement Administration
Bristol, Virginia

CLERK'S OFFICE U.S. DISTRICT COURT
AT ABINGDON, VA
FILED

JUL 25 2024

LAURA A AUSTIN, CLERK
BY: _____
DEPUTY CLERK

I, Special Agent Joshua Evans, being duly sworn hereby depose and say:

## INTRODUCTION AND OFFICER BACKGROUND

1. The purpose of this application and affidavit is to secure a search warrant for methamphetamine and fentanyl conspiracy related evidence and equipment/supplies.

2. This affiant, after obtaining and reviewing information, believes there is evidence of a conspiracy to distribute methamphetamine and fentanyl being maintained at 2031 Apperson Drive, Salem, Virginia 24153 Unit #D028, located in the Western District of Virginia, (hereafter referred to as the "Subject Storage Unit") in violation of 21 U.S.C. § 846. Methamphetamine and fentanyl are both Schedule II controlled substances.

3. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed for approximately (12) years. During my employment I have received comprehensive classroom training from the DEA in specialized narcotic investigative matters including but not limited to drug interdiction, drug detection, money laundering techniques and schemes, smuggling, and the investigation of individuals and organizations involving the smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances and controlled substance precursors. I have participated in the investigations and subsequent arrests of numerous individuals involved with the trafficking of methamphetamine and fentanyl. I have also executed numerous search warrants related to the trafficking and manufacturing of methamphetamine and fentanyl.

4. Based on my training and experience, my own investigation of this matter, and the facts set forth in this affidavit, I submit that there is probable cause to believe that

violations of 21 U.S.C. § 846 have been committed, are being committed, and/or will be committed by ROBERT TYRONE IRVING, a/k/a "Dollar Rob," a/k/a "Smooth," a/k/a "BR" (hereafter referred to as "IRVING"), who has been identified as residing at the 4845 Nelms Lane NE, Roanoke, Virginia 24019. There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations, and/or lead to the identification of individuals who are engaged in the commission of these offenses in concert with IRVING.

5. The facts contained in this affidavit come from my participation in the investigation of IRVING, my training and experience, information provided by cooperating witnesses (hereafter referred to as "CW-1" and "CW-2"), information acquired through the use of a confidential human source (hereafter referred to as "CHS"), and information that I have obtained from other law enforcement agents and/or officers who are familiar with this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Cellular Telephones (T1 & T2)

1. On or about February 02, 2024, your Affiant became aware of IRVING as it pertained to his involvement in the trafficking and subsequent distribution of methamphetamine in both Smyth and Washington Counties (i.e., Southwest Virginia), located in the Western District of Virginia. At the time, investigating law enforcement believed that IRVING only distributed drugs to Southwest Virginia-based customers when those individuals would travel to meet with IRVING in Roanoke, Virginia. Over the course of the investigation, law enforcement discovered that in addition to distributing illicit narcotics in Roanoke, Virginia, IRVING had personally transported illegal narcotics (i.e., distribution quantities of both methamphetamine and fentanyl) to customers and/or sub-distributors for the drugs who

are located in Southwest Virginia. As part of the investigation, the Virginia State Police communicated with other law enforcement agencies in Virginia, and as a result determined that several agencies (i.e., the Washington County Sheriff's Office, the Smyth County Sheriff's Office, the Roanoke City and Roanoke County Police Departments, the Drug Enforcement Administration, and the Federal Bureau of Investigation) were investigating the illegal activities of IRVING and others with whom he associated. Pursuant to the information exchange, agents, detectives, task force officers, and/or investigators from each agency and/or department agreed to combine resources in a multi-jurisdictional effort to identify, interdict, and thwart the unlawful activities that IRVING has been attributed to.

    2.    Over the course of the investigation, your Affiant learned that on March 05, 2024, law enforcement officers of the Smyth County Sheriff's Office (SCSO) and the Virginia State Police's Holston River Regional Drug Task Force (HRDTF) while accompanied by an officer of the United States Probation and Parole Office (USPO) executed a search warrant at 622 Thompson Road, Marion, Virginia 24354. The search was in relation to Luis Bradley "Brad" Garza (hereafter referred to as "GARZA") as it pertained to his involvement in the trafficking and subsequent distribution of multi-ounce quantities (i.e., more than three) of methamphetamine in Smyth County, Virginia. Over the course of the search warrant, law enforcement discovered and subsequently seized approximately 674 grams of crystal methamphetamine, $6,200 in U.S. paper currency, and two cellular telephones, one of which was identified as having belonged to GARZA. As the search occurred, GARZA participated in a recorded *Mirandized* interview with law enforcement outside of his residence. During the interview, GARZA told police that the methamphetamine seized during the search of his residence belonged to him. Additionally, GARZA made the statement "ya'll waited just long enough for me to get them what I owed them." In this context, your Affiant inferred that GARZA was able to pay his drug supplier (i.e., "them") prior to the execution of the search warrant, and as a result, GARZA was not concerned about being indebted to his supplier for

the methamphetamine seized at his residence. GARZA explained that he had recently owed his source of supply for methamphetamine a large sum of money. GARZA further detailed, that "a while back," (i.e., in December 2023) he had introduced, and vouched for someone else to "work" (i.e., obtain and sub-distribute) illegal drugs provided by GARZA's source for illegal narcotics. As a result of his recommendation, that individual began receiving illegal narcotics from GARZA's supplier. GARZA further detailed that in mid-to-late-December 2023, the above-mentioned individual was "popped" (i.e., arrested) in the Salem, Virginia-area, and found to be in possession of approximately "$20,000" worth of illegal narcotics. As a result according to GARZA, on or about January 01, 2024, GARZA's drug supplier reached out to him, and notified GARZA that he was now responsible for the cost of the drugs (i.e., approximately $20,000) seized by police as a result of the incident. GARZA explained that he had just finished paying off that drug debt "about a week and a half ago" (i.e., in late-February 2024). When asked, GARZA stated that the methamphetamine that was seized during the search of his residence was what "was left over" (i.e., what remained) after he paid off the drug debt, and that he would only now begin to profit from the sale of methamphetamine had the search not occurred.

    3.    During the interview, GARZA vaguely spoke about his source of supply's identity. GARZA identified his source of supply as a male and stated that "he (i.e., his supplier) would be the one to know everything," in reference to being able to provide information to law enforcement regarding the scope of the drug trafficking organization. GARZA stated that on at least one occasion, he had received "four pounds" (i.e., approximately 1800 grams) of methamphetamine from his supplier. GARZA further explained that his source of supply was not local, and described their relationship as "friendly," but more analogous to one pertaining to business (i.e., profiting from illegal drug trafficking). GARZA refused to provide specific information (i.e., the identifiers and/or location) of his source of supply for illegal narcotics due to fearing for his and his family's safety if he did provide that information. Pursuant to

the interview and search, GARZA was arrested and transported to the Southwestern Virginia Regional Jail, where he was remanded to the custody of the jail for violating the conditions of federal supervised release.

4.  On or about March 20, 2024, participating law enforcement submitted GARZA's cellular telephone to the Virginia State Police for forensic examination. Following the examination, and on or about March 24, 2024, your Affiant was provided with a forensic image and report of the digital contents stored within the device. On or about May 28, 2024, law enforcement conducted an analytical review of the phone's contents, and as a result identified a text-message chain between GARZA and telephone number (276) 798-2198 (hereafter referred to as "T1"). T1 was saved in GARZA's device as the stored contact "Smooth," which your Affiant knows to be a nickname used by IRVING. Prior to the analysis, investigators knew T1 to be utilized by IRVING, as it was discovered as being associated with IRVING's CashApp account "allaboutdollaz540." On March 05, 2024, and as part of communication between GARZA and T1, GARZA sent, "I don't want you to rush but it isn't gonna be too late is it. I just do t [sic] want my wife getting pissy (i.e., upset), not going to mention the neighbors be nosy as [slur]." GARZA continued, "Yo, what's good big bro? Everything OK with you? Just wanted to check because you never showed up last night. Get me when you can." In this context, law enforcement surmised that at some point, both GARZA and IRVING had made a previous arrangement to meet at GARZA's residence in Marion, Virginia, which is located in the Western District of Virginia. Furthermore, and according to previous statements made by GARZA, law enforcement believed that the nature of the meeting (had it occurred) would have likely been related to the acquisition and/or distribution of methamphetamine.

5.  On June 17, 2024, law enforcement officers of the Washington County Sheriff's Office (WCSO) executed a search warrant at a residence in Abingdon, Virginia, also located in the Western District of Virginia. As a result of the search, participating law enforcement

discovered and ultimately seized a distribution quantity of fentanyl-laced pills (i.e., counterfeit, or "pressed" Oxycodone-hydrochloride pills that are known to contain the drug fentanyl), "powdered" fentanyl, methamphetamine, indicia of drug distribution (i.e., digital scales and unused plastic baggies), two cellular telephones, and approximately $4,072 in U.S. currency. Pursuant to the search warrant, CW-1, who was at the time a subject of the underlying investigation, participated in a *Mirandized* interview with WCSO narcotics investigators. During the interview, CW-1 detailed that the drugs (i.e., fentanyl and methamphetamine) found at the residence belonged to him/her. Furthermore, CW-1 identified his/her source of supply for methamphetamine and fentanyl as being a male named "Rob" (i.e., IRVING) who resided in Roanoke, Virginia. As part of the interview, CW-1 consented to a search of his/her cellular telephone and further facilitated the search of the device by providing his/her "passcode."

6. On June 25, 2024, law enforcement reviewed the contents of CW-1's cellular telephone, and as a result discovered text-message communication and stored contact information (i.e., saved numbers and their associated aliases and/or names) on the device. In reviewing that content, law enforcement identified telephone number (540) 315-0742 (hereafter referred to as "T2"), which was saved in the device's contact list as "BR," Which your Affiant knows to be another nickname used by IRVING. As a result, law enforcement reviewed a text message chain between CW-1 and T2 that began on April 05, 2024. As part of that communication, CW-1 sent, "When can I head up?" T2 responded, "U see call n...I;m sorry friend...Let me explain...Let's talk." CW-1 replied, "5450...At exit...I'm here." T2 replied, "I here...Ready Is you coming?" CW-1 responded, "Is there any way that you could meet us halfway?" Based on CW-1's interview and for the reasons described herein, law enforcement believes T2 is utilized by IRVING.

7. On April 07, 2024, the conversation continued when CW-1 sent, "We still coming but it's gonna be late." T2 responded, "Just come in the morning or just get room to night." CW-1 replied, "K we gotta shower then head that way." Several hours later, and as

part of that communication CW-1 sent, "On our way…We like 20 mins away…Well we are here…Waiting across from cookout." T2 then asked, "How much you got." CW-1 replied, "5450…Soon as I get back I will be able to send you most of the rest…u already got the 800 so it will be 6250." CW-1 continued, "It's so dry ar [sic] home rhay [sic] we probably will be right back up here tomorrow." Your Affiant understands that this communication is related to an occasion when CW-1 traveled to Roanoke, Virginia and waited near a Cookout restaurant (i.e., "waiting across from cookout"), before meeting IRVING to purchase $5,450 (i.e., "5450") worth of methamphetamine and powdered fentanyl.

8. As part of the communication between CW-1 and T2, and on April 20, 2024, T2 sent, "I'm down here I got something with me." CW-1 responded, "Swing by." T2 then replied, "Yeah…*with a thumbs up emoji*." Law enforcement believes that this communication is related to an occasion where IRVING delivered a distribution quantity of illegal narcotics to CW-1 in Washington County, Virginia. On May 18, 2024, CW-1 sent "Sup." T2 responded, "You got something for me." As part of that conversation, and on May 22, 2024, T2 sent, "How much now…Hello." CW-1 replied, "Everyone is [sic] suppose [sic] to hit me up later this evening." T2 responded, "I hope you be at ur house." CW-1 replied, "I'm Herr [sic] waiting on you." T2 then sent, "Get the rest…were you…You not here." Law enforcement officers familiar with the activities of CW-1, told your Affiant that this particular communication outlines an incident when IRVING delivered a distribution quantity of methamphetamine to CW-1's residence in Washington County, Virginia.

9. On June 28, 2024, investigating law enforcement applied for, received, and subsequently executed two search warrants for the real-time location (i.e., "GPS") information associated with both T1 (i.e., a telephone number serviced by AT&T Wireless) and T2 (i.e., a telephone number serviced by Verizon Wireless), and on or about June 29, 2024, they began receiving the responsive location information associated with that request. Between June 29, 2024, and July 20, 2024, and while monitoring the location of T1 and T2, law enforcement

identified both devices as having traveled from Roanoke, Virginia to Washington County, Virginia and/or the City of Bristol, Virginia on multiple (i.e., more than five) occasions.

### CW-2 Traffic Stop

10.     On July 01, 2024, law enforcement officers of the WCSO and VSP conducted a traffic stop on a gray Toyota Scion at 20652 Haskell Station Road, Bristol, Virginia 24202. Subsequent to the stop, law enforcement identified the driver and sole occupant as CW-2. Over the course of the encounter, CW-2 stepped out of the vehicle, and in doing so, law enforcement observed CW-2 attempt to conceal a "small red zipper bag" from law enforcement observation. At this time, law enforcement asked CW-2 what was in the bag, at which point CW-2 identified the bag as containing "crumbs" (i.e., a small amount) of methamphetamine. Law enforcement then conducted a search of the bag, and the passenger compartment of CW-2's vehicle, and as a result located suspected methamphetamine, fentanyl, drug paraphernalia (i.e., syringes and a glass smoking device), as well as digital scales. Pursuant to the search, CW-2 was advised of his/her *Miranda* rights and agreed to speak with investigating law enforcement about the origin of the narcotics found during the incident. According to CW-2, he/she had purchased an ounce (i.e., approximately 28 grams) of methamphetamine from Brock Widener (hereafter referred to as "WIDENER") "a couple of days" prior to the traffic stop. CW-2 further detailed that on that occasion, he/she met WIDENER at his residence, which CW-2 described as the residence located at 216 A Street SE, Abingdon, Virginia. According to CW-2, while there, CW-2 witnessed WIDENER as being in possession of multiple (i.e., more than four) ounces of methamphetamine. CW-2 further commented, "Widener must be well connected (i.e., have a reliable source of supply for methamphetamine) and whoever it was must be an idiot to deal with him (i.e., WIDENER) on that much dope (i.e., methamphetamine)."

### Controlled Purchases and Drug "Drop"

11.     On July 02, 2024, law enforcement officers of the HRDTF utilized a CHS to execute a controlled purchase of one pound (i.e., approximately 450 grams) of

methamphetamine from IRVING in Washington County, Virginia, within the Western District of Virginia. Over the course of the controlled purchase, and according to the real-time location data provided by AT&T and Verizon, both T1 and T2 were identified as being near the location of the purchase. At the conclusion of the purchase, that same location data showed both T1 and T2 as having departed the area, before ultimately becoming stationary at or near the Hard Rock Casino in Bristol, Virginia. Additionally, surveillance indicated that IRVING utilized a 2015 Dodge RAM (hereafter referred to as "Vehicle 1") to conceal, transport, and deliver the methamphetamine to the CHS. The 2015 Dodge RAM's Virginia registration "TNY-1347" is registered to 4845 Nelms Lane NE, Roanoke, Virginia 24019.

12. On July 16, 2024, law enforcement officers of the HRDTF again employed a CHS to purchase a second pound (i.e., 450-gram quantity) of methamphetamine from IRVING at 16032 Fifteen Mile Boulevard, Abingdon, Virginia 24211 (i.e., a Walmart Supercenter). During this controlled purchase law enforcement surveillance captured IRVING retrieving the methamphetamine from underneath the spare tire compartment of a 2012 Cadillac SRX bearing Virginia temporary registration "58810R" (hereafter referred to as "Vehicle 2") before ultimately providing the drugs to the CHS. A DMV query for Virginia temporary registration "58810R" indicated that the vehicle was registered to "Robert Tyrone Irving" at 4845 Nelms Lane NE, Roanoke, Virginia 24019. Prior to, and over the course of the controlled purchase law enforcement noted the real-time location data associated with both T1 and T2 to be consistent with IRVING having traveled from Roanoke, Virginia to the location of the controlled purchase. At the conclusion of the controlled purchase, IRVING departed the area, and was loosely followed by law enforcement. Surveilling law enforcement observed IRVING driving Vehicle 2 approximately "100 yards" from the 216 A Street SE, Abingdon, Virginia residence. The location data associated with T1 and T2 was also consistent with IRVING being near the 216 A Street SE, Abingdon, Virginia residence both prior to and after the controlled purchase. Law enforcement officers of the HRDTF then reconvened with the CHS, during

which time the CHS stated after receiving the "pound" of methamphetamine from IRVING, he/she asked, "Is this two (i.e., two pounds of methamphetamine)?" The CHS then explained that IRVING replied, "I got you—do you need any other?" The CHS told IRVING that he/she would accept any quantity of illegal narcotics that IRVING was willing to provide him/her with. IRVING then requested that the CHS meet him back at the Abingdon Walmart. According to the CHS, he/she inferred that IRVING agreed to provide the CHS with an additional pound of methamphetamine, and an unknown amount of fentanyl (i.e., "other"). The CHS then explained that IRVING told him/her that he was going to "Brock's" (i.e., WIDENER's residence) to retrieve the drugs.

13. While awaiting IRVING's return to the Abingdon Walmart, law enforcement observed the geolocation data associated with T1 and T2 as being indicative of IRVING traveling southbound on Interstate 81, before becoming stationary near the Hard Rock Casino in Bristol, Virginia. During which time, law enforcement officers located Vehicle 2 in the Hard Rock Casino parking lot. Approximately one hour after arriving to the casino, IRVING and a second male (identified as Sheridan Preston) left the casino in Vehicle 2 and then proceeded to travel back to Roanoke, Virginia.

14. On July 18, 2024, and while monitoring the location information associated with both T1 and T2, law enforcement became aware that it was likely that IRVING was traveling from Roanoke, Virginia towards Southwest Virginia. Approximately two hours later, IRVING utilized T2 to reach out to the CHS via text-message and sent, "Were you—hello." At the direction of law enforcement, the CHS advised IRVING that he/she was out of town and as a result would be unable to meet with IRVING. IRVING then responded, "I hide it." The CHS replied, "Ok—under the porch or what dude—What about on top of tire of that suv close to the house or something." IRVING then sent, "Just chill finish enjoying you." In this context, both law enforcement and the CHS inferred that IRVING was delivering the "pound" of methamphetamine and/or the unknown quantity of fentanyl that he had promised to provide

the CHS with on July 16, 2024. Prior to and over the course of communicating with the CHS, the location data associated with T1 and T2 was indicative of IRVING being near the CHS's residence in Washington County, Virginia. At the conclusion of the communication between the CHS and IRVING, law enforcement observed the geolocation of both T1 and T2 as being consistent with traveling southbound on Interstate 81, before ultimately static near the Hard Rock Casino in Bristol, Virginia. Law enforcement then traveled to the location where IRVING was suspected as having concealed the narcotics (i.e., Abingdon, Virginia), and as a result recovered a plastic Ziploc-style bag containing approximately 222 grams of suspected methamphetamine hidden in the wheel well of a vehicle located on the property.

15. On July 19, 2024, law enforcement queried Motorola's Vigilant license plate reader (LPR) database for "hits" or a positive identification and/or sighting of Vehicle 1, or Vehicle 2 between July 18, 2024, and July 19, 2024. The query returned a photograph and the positive identification of Vehicle 2 as being detected at or near the intersection of West State Street and 24th Street in Bristol, Tennessee on July 19, 2024, at approximately 08:44AM. This location is approximately one mile from the Hard Rock Casino in Bristol, Virginia. On July 20, 2024, at approximately 03:05AM, the geolocation information connected with both T1 and T2 showed IRVING as having returned to Roanoke, Virginia.

### 4845 Nelms Lane NE

16. On July 12, 2024, as part of the investigation into the illegal activities of IRVING, and to assist with surveillance efforts, agents from the Virginia State Police installed a "pedestal" camera at IRVING's residence, which is located at 4845 Nelms Lane NE, Roanoke, Virginia 24019. On July 12, 2024, at approximately 5:28PM, the camera showed Vehicle 2 arriving in front of 4845 Nelms Lane NE, Roanoke, Virginia 24019. Shortly afterwards a male fitting the description and physical characteristics of IRVING exited Vehicle 2 and walked up the driveway towards 4845 Nelms Lane NE, Roanoke, Virginia 24019.

17. Between July 19, 2024, and July 21, 2024, law enforcement reviewed the

recorded video surveillance footage pertaining to the 4845 Nelms Lane NE residence, and as a result observed that on July 16, 2024, at approximately 9:50AM IRVING left the residence in Vehicle 2. The GPS data associated with both T1 and T2 was consistent with IRVING having left the residence, and at approximately 11:54AM, the location data showed IRVING leaving the greater Roanoke, Virginia area before ultimately arriving in Abingdon, Virginia (i.e., the generalized location where the controlled purchase occurred) at approximately 3:09PM. At approximately 7:00PM, law enforcement observed IRVING traveling northbound on Interstate 81 in Vehicle 2 towards Roanoke, Virginia. At approximately 9:53PM, the geolocation information related to both T1 and T2 was indicative of IRVING having arrived in Roanoke, Virginia, before ultimately becoming stationary near the 4845 Nelms Lane NE, Roanoke, Virginia 24019. Due to the time of day and lack of ambient light, the surveillance camera was unable to capture IRVING's arrival back to the home.

18.     On July 18, 2024, at approximately 11:22AM, camera surveillance captured IRVING leaving 4845 Nelms Lane NE, Roanoke, Virginia 24019, in Vehicle 2. The geolocation data associated with T1 and T2 showed that IRVING traveled to what appeared to be several locations in the City of Roanoke, before returning to the 4845 Nelms Lane NE, Roanoke, Virginia 24019, in Vehicle 2 at approximately 1:18PM. Approximately 20 minutes later, and at 1:38PM, IRVING is again observed, leaving the 4845 Nelms Lane NE, Roanoke, Virginia 24019, in Vehicle 2. The geolocation data associated with both T1 and T2 was consistent with IRVING being in the City of Roanoke until approximately 5:53PM, when the location of T1 and/or T2 was indicative that IRVING was traveling towards Interstate 81. At approximately 6:08PM, the location data was consistent with IRVING traveling southbound on Interstate 81, and at approximately 8:24PM the location data associated with T1 and T2 provided that IRVING was in the general area where the 222 grams of methamphetamine was recovered by law enforcement (i.e., Abingdon, Virginia).

19.     In conclusion, law enforcement believes that IRVING traveled to the Hard

Rock Casino in Bristol, Virginia after delivering 222 grams of methamphetamine to the CHS's residence in Abingdon, Virginia. Additionally, the GPS data linked to both T1 and T2, and the LPR sighting of Vehicle 2 on July 19, 2024, is indicative that IRVING stayed in the greater Bristol, Virginia area overnight, before returning to Roanoke, Virginia and ultimately the 4845 Nelms Lane NE, Roanoke, Virginia 24019, on what appeared to be (i.e., based on GPS location information) July 20, 2024, at approximately 3:23AM. In reviewing the surveillance camera footage associated with 4845 Nelms Lane NE, Roanoke, Virginia 24019, pedestal camera, your Affiant observed Vehicle 2 to be at that residence on July 20, 2024, at approximately 6:01AM (i.e., the earliest point that the camera had sufficient ambient light to view the recording remotely).

### Storage Unit (2031 Apperson Drive Unit D028, hereinafter "Subject Storage Unit")

20. On July 24, 2024, law enforcement observed IRVING, through phone GPS location response, traveling southbound toward Washington County from Roanoke. Law Enforcement officers conducted a traffic stop on IRVING. A subsequent search of the vehicle IRVING was driving revealed approximately 1800 grams of suspected methamphetamine and approximately 25 grams of suspected fentanyl. IRVING was transported to the Washington Country Sheriff's Office and a post Miranda interview was conducted. During the course of the interview, IRVING stated that he had a storage unit and confirmed that he had approximately sixty (60) pounds of methamphetamine located inside the unit. IRVING provided directions to the storage unit and pointed out the location as Virginia Varsity Storage at 2031 Apperson Drive, Salem, Virginia. IRVING confirmed that the account for the unit is in his name and that he currently has a key to it and is the only one with access to the unit.

21. Law Enforcement agents went to Virginia Varsity Storage where the Subject Storage Unit is located and confirmed that IRVING had a storage unit account at that address and that the unit number was D028.

22. Based on my training, experience, and conversations with other law enforcement officers, I am aware that individuals who distribute and/or conspire to distribute fentanyl and/or methamphetamine typically maintain the drugs themselves, as well as materials to facilitate the distribution of those drugs, including: financial records, mobile cellular devices, (i.e., cellular telephones and/or tablet computer(s)), the proceeds of illegal drug sales, and other documents as described in Attachment B on their persons, inside of their residences (which includes related garages, outbuildings, campers and/or other recreational vehicles), as well as inside of their vehicles, and inside of other locations under their control such as self-storage units. Additionally, your Affiant knows that based on my training and experience, that individuals who are engaged in the distribution of illegal drugs routinely keep about their person(s), residences, vehicle(s), and/or other locations under their control such as self-storage units firearms and firearms-related equipment (i.e., ammunition, instruments to maintain those weapons, and body armor) to protect their supply of illegal drugs and/or the proceeds of illegal drug sales from both others who are engaged in similar illegal activities and law enforcement. Furthermore, in addition to cash, or cash-equivalents, I know that it is common for drug dealers to accept firearms and firearms related equipment in exchange for illegal narcotics.

23. Based upon the facts set forth above, I believe that there is probable cause for the issuance of a search warrant for the Subject Storage Unit, as there is probable cause to believe that there is evidence of violations of Title 21, United States Code, Section 846 maintained at that location. Furthermore, I submit the facts set forth herein present reasonable cause as to why the requested search warrant should be authorized for execution during any time of day or night.



Joshua Evans, Special Agent (DEA)

Subscribed and sworn to before me, ~~this~~ telephonically the 24th day of July, 2023, in ~~Abingdon~~ Lebanon, Virginia.

Pamela Meade Sargent

United States Magistrate Judge

Western District of Virginia

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the following:

2031 Apperson Drive, Salem, Virginia 24153 Unit #D028; to include any vehicle(s) and person(s) present.





## ATTACHMENT B

### Particular Things to Be Seized

1. Narcotics, methamphetamine, fentanyl, and other illegal controlled substances.

2. Paraphernalia for packaging, cutting, weighing and distributing illegal drugs, including but not limited to, scales, baggies, and cutting agents.

3. Documentation, including but not limited to: messages, records, ledgers, notes, mail, letters, e-mails, e-mail addresses, telephone numbers, vehicle rental receipts, hotel receipts, addresses and/or other personal contact information relating to the transportation, distribution, and/or procurement of fentanyl and/or methamphetamine.

4. Digital access information, including but not limited to: usernames, passwords, security keys, website login information, and internet protocol (IP) logs.

5. Photographs and/or videos depicting fentanyl and/or methamphetamine, its distribution or concealment, and the cash or cash equivalent proceeds from the distribution of the drugs.

6. Items or articles of personal property that tend to show ownership, dominion, or control of the property within or related vehicles. Such items or articles include, but are not limited to: personal identification, personal correspondence, checkbooks, notes, keys, and motor vehicle related documents such as vehicle titles and vehicle registration information.

7. Financial documents, including but not limited to: Automated Teller Machine (ATM) receipts, mobile payment service information, bank statements, components of the exchange and/or storage of virtual currency (i.e., private keys and recovery seeds—stored on or accessible via a virtual currency wallet (e.g., Mycelium, Bread, Coinbase, etc.), and or any others item demonstrating the acquisition, concealment, or expenditure of assets.

8. Large amounts of paper currency (exceeding $500.00 in value) or other readily transportable assets, that are routinely used as cash equivalents, including but not limited to: money orders, cashier's checks, casino "chips," or tokens, and prepaid debit/credit cards.

9. Virtual, or cryptocurrency (e.g., Bitcoin, Ethereum, Litecoin, etc.) that exceeds $1,000 in value at the time of its discovery.

10. Firearms, and firearms related equipment such as ammunition, ammunition magazines, holsters, bullet-proof vests, firearms cases/boxes, cleaning kits and documentation regarding the acquisition and disposition of firearms.

11. Items listed in Paragraphs 3 through 9 may be stored in electronic devices. These devices include but are not limited to: computers, external hard drives, universal serial bus (USB) flash drives, secure digital (SD) memory cards, mobile devices such as cellular telephones and tablet computers, digital cameras, hard ware digital wallets (which are used for long-term storage of virtual currency), currency counting machines, and surveillance camera storage devices. The aforementioned items may be seized.

12. Any locked or closed container(s) believed to contain any of the above listed evidence.